# In the United States Court of Federal Claims

No. 16-796
(Filed:  July 18, 2017)

| | |
|---|---|
| KARI L. MARTIN,<br><br>              Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>              Defendant. | Military Pay, Combat Related Special Compensation, 10 U.S.C. § 1413a, Hazardous Service, Administrative Implementation of a Statute. |

*Gary R. Myers*, Weare, NH, for plaintiff.

*Douglas G. Edelschick*, U.S. Department of Justice – Commercial Lit. Branch, Washington, DC, for defendant.

## OPINION

**FUTEY**, *Senior Judge*

This case is before the Court on cross motions for judgment on the administrative record. The administrative record was filed on September 15, 2016. Defendant filed its motion on December 15, 2016, while plaintiff filed her cross motion and response on March 15, 2017. Defendant filed its reply on April 12, 2017, and plaintiff filed her reply on April 23, 2017. Plaintiff seeks a declaration that the Board of Correction for Naval Records' ("BCNR") interpretation of the Hazardous Duty provision of 10 U.S.C. § 1413a(e)(2)(B) was in error, and a remand such that the BCNR may determine the

appropriate amount of combat related special compensation plaintiff alleges she is owed. Defendant argues that the Department of Defense's ("DoD") interpretation of the term "hazardous service" is in accordance with the law, and that the BCNR correctly interpreted the statute when denying plaintiff's claim for special compensation.

The Court held oral argument on June 22, 2017. The matter is now ripe for disposition.

## I. BACKGROUND

### a. Factual Background

#### i. *Legal Framework for Military Retirement Pay, VA Disability Benefits, and Combat-Related Special Compensation*

Service members of a branch of the United States military are entitled to military disability retirement pay when an individual suffers from an impairment that renders him or her unfit for further military service. *See Stine v. United States*, 92 Fed. Cl. 776 (2010). Military retirement pay is provided by the DoD pursuant to 10 U.S.C. § 1201. Additionally, the Department of Veterans Affairs ("VA") has the authority to assign a disability rating to service members and compensate them for their injuries. The VA determines whether an injury was incurred during military service (or if a condition which existed prior to service was aggravated by military service) and evaluates how those injuries affect the service member's civilian employability. *See id.* (noting that the military uses disability rating to determine whether a service member is fit to perform the duties attendant with an individual's office, grade, rank, or rating, while the VA employs

a more holistic approach in determining an individual's capacity to function and perform tasks in the civilian world).

Typically, concurrent receipt of the full amounts of VA disability compensation and military retirement pay is prohibited – retired service members eligible for both payments are required to waive a portion of their military retirement pay in an amount equal to their VA disability compensation. 38 U.S.C. § 5305. Congress, however, has created some exceptions to this general rule, one of which is for combat-related special compensation ("CRSC"). Codified at 10 U.S.C. § 1413a, it provides that an eligible retiree is a member of the uniformed services who 1) is entitled to retired pay; and 2) has a combat-related disability. 10 U.S.C. § 1413a(c). The statute goes on to define a combat-related disability as:

> a disability that is compensable under the laws administered by the Secretary of Veterans Affairs and that –
>> (1) is attributable to an injury for which the member was awarded the Purple Heart; or
>> (2) was incurred (as determined under criteria prescribed by the Secretary of Defense) – (A) as a direct result of armed conflict; (B) while engaged in hazardous service; (C) in the performance of duty under conditions simulating war; or (D) through an instrumentality of war.

10 U.S.C. § 1413a(e). In the instant case, plaintiff alleges that she incurred her VA-rated disability while engaged in hazardous service, thus meeting the requirements of section 10 U.S.C. § 1413a(e)(2)(B).

The background of the CRSC statute merits discussion. The statute, originally conceived in 2002, permitted a limited group of retirees to obtain immediate receipt of concurrent pay if they had completed 20 years or more of creditable military service and

had a "combat-related disability." National Defense Authorization Act ("NDAA") for

Fiscal Year 2003, Pub. L. No. 107-314, § 636, 116 Stat. 2,574-76, *codified at* 10 U.S.C. §

1413a.[1]

Of particular importance to the instant case is the fact that Congress provided that

"[t]he secretary of Defense shall prescribe procedures and criteria under which a disabled

uniformed services retiree may apply" for CRSC. 10 U.S.C. § 1413a(d). The statute

further notes that the question of whether a disability is incurred "while engaged in

hazardous service" shall be "determined under criteria prescribed by the Department of

Defense." 10 U.S.C. § 1413a(e)(2). It is clear then that it was the intent of Congress to

leave to the Secretary of Defense and the Department of Defense the determination of

what kinds of injuries were to be compensable under the CRSC statute. This is confirmed

by the statements of members of Congress who worked on passing the relevant statute.

*See* 148 Cong. Rec. 21,844 (2002) (Sen. Warner, ranking member of the Senate Armed

Services Committee noting that Congress "will rely on the Secretary of Defense to

exercise his discretion to further define the nature of this service."); 148 Cong. Rec.

21,808 (2002) (statement of Rep. Hunter) ("The agreement does require the Secretary of

Defense to establish a process and criteria for evaluating whether a disability is combat

related.").

---

[1] "Combat-related disability" originally required that the disability not be rated at less
than 60 percent by the military. NDAA for Fiscal year 2003, Pub. L. No. 107-314, § 636,
116 Stat. 2,574-76 (2002). The following year, Congress amended the definition to
include disabilities that are rated less than 60 percent. NDAA for Fiscal Year 2004, Pub.
L. No. 108-136, § 642, 117 Stat. 1516-17 (2003).

As a result of this delegation of authority, the DoD has produced several

documents which set forth the criteria that eligible service members must meet in order to

receive CRSC. These procedures and criteria are set forth in DD Form 2860. AR 298-

301. This Form was originally created in 2004 and amended and supplemented in 2008.

The 2004 directive, in pertinent part, defines the phrase "engaged in hazardous service"

as follows:

> **While Engaged in Hazardous Service** – Such service includes, but is not
> limited to, aerial flight, parachute duty, demolition duty, experimental
> stress duty, and diving duty. A finding that a disability is the result of such
> hazardous service requires that the injury or disease be the direct result of
> actions taken in the performance of such service. Travel to and from such
> service, or actions incidental to a normal duty status not considered
> hazardous are not included.

AR 295. This language is mirrored in the DoD Financial Management Regulation

(DA28-48). *See* DA 37; DoD 7000.14-R, *Financial Management Regulation*, vol. 7B, ch.

63, § 630602 (Dep't of Defense Dec. 2013). The updated 2008 version of DD Form 2860

espouses a slightly different definition:

> **WHILE ENGAGED IN HAZARDOUS SERVICE (HS)** – The disability
> was incurred during performance of duties that present a higher degree of
> danger to Service personnel due to the level of exposure to actual or
> simulated armed conflict. The fact that a member incurred the disability
> during a period of hazardous service is not sufficient by itself to support a
> combat-related determination. There must be a definite, documented, causal
> relationship between the hazardous service and the resulting disability.
> Such service includes, but is not limited to, aerial flight, parachute duty,
> demolition duty, experimental stress duty, diving duty, and rescue missions.

AR 301. The DoD requires that all applications for CRSC must be submitted in

accordance with DD Form 2860. DoD 7000.14-R, *Financial Management Regulation*,

vol. 7B, ch. 63, § 630301 (Dep't of Defense Dec. 2013) ("A member may not be paid

CRSC unless he or she has applied for and elected to receive compensation under the CRSC program by filing an application on Department of Defense (DD) Form 2860 . . . with the Military Department from which he or she retired.").

### ii. *CDR Martin's Military Service*

Plaintiff served on active duty in the United States Navy, Nurse Corps, for over 18 years, from August 1995 through April 2014. AR 16. Plaintiff's last deployment of active duty was to Camp Bastion, Afghanistan, in support of Operation Enduring Freedom, where she served in a combat trauma unit at Bastion Hospital from October 2010 until April 2011. AR 48, 51, 57. While stationed at Bastion Hospital, plaintiff was tasked with rendering aid to patients who had experienced gunshot wounds, blast injuries, amputations, burns, and other injuries associated with the ongoing military conflict in Afghanistan. AR 80, 82, 94-95.

After completing her deployment at Camp Bastion, plaintiff began suffering from post-traumatic stress disorder ("PTSD") as a result of her "persistent, recurrent, involuntary, and intrusive memories of her Bastion Hospital Experiences." AR 49. From October 2012 to December 2013, plaintiff was a patient at Naval Hospital Beaufort for her PTSD, and continued seeing Dr. Thomas Collins, a psychologist, through 2014. AR 48. Additionally, plaintiff was hospitalized for 45 days in the inpatient PTSD treatment program at Laurel Ridge in San Antonio, TX. AR 48. In September 2013, a medical evaluation board determined that plaintiff suffered from PTSD (moderate), depressive disorder, and alcohol abuse (in early remission). AR 51-55. In February 2014, plaintiff was evaluated by a physical evaluation board ("PEB"), which determined that plaintiff's

PTSD significantly interfered with the performance of her duties, was an unfitting medical condition, and warranted placement on the TDRL with a 50 percent disability rating. AR 56-58. In April 2014, the Navy honorably discharged plaintiff from active service and placed her on the TDRL. AR 16.

### b. Procedural Background

In June 2014, plaintiff submitted a claim on DD Form 2860 seeking CRSC. The CRSC Board issued two decisions upon the plaintiff's application and request for reconsideration. The Board denied plaintiff's initial application on July 14, 2014 and concluded that the PTSD suffered by plaintiff is not combat-related. The denial was due to the failure to establish that specific combat related events caused plaintiff's diagnosis. AR 109. After the denial of CRSC, plaintiff requested for the CRSC Board's reconsideration, and asserted specifically that she meets the Hazardous Duty Standard provided for in 10 U.S.C. §1413a(e)(2)(B). AR 112-14.

On September 9, 2014, the Board denied CDR Martin's application for CRSC a second time after reconsideration, on the same ground that the application package did not establish that specific combat-related events caused plaintiff's diagnosis. Again, the Board asserted that "there must be a definite causal relationship between the armed (or simulated) conflict and the resulting disability." AR 126. "A combat-related determination under hazardous service criteria requires documented evidence that the disability claimed be the direct result of a specific combat-related event, which caused the disability, e.g., parachute mishap, aircraft ejections, or dive trauma." AR 126.

Upon appeal, the BCNR found on August 19, 2015 that "the evidence submitted was insufficient to establish the existence of probable material error or injustice" and thus affirmed the CRSC Board's decision. AR 272. The BCNR disagreed with the argument that "there is no requirement that the injury be combat related since Congressional intent was to create a separate hazardous duty category." *Id.* The BCNR felt "that Congress intended to require a specific combat related nexus to injuries suffered as a result of hazardous duty" because "it was not Congress' intent to include any and all hazardous duty injuries for consideration of combat related special compensation." AR 273. The BCNR provided an example that "diving duty", even though listed as an example of hazardous duty in DOD guidance, would not qualify under 10 U.S.C. § 1413a if it is done to help salvage a civil war relic, because the statute was implemented to cover combat-related injuries. AR 273.

The BCNR determined that "performing medical work in a combat zone without specific combat-related nexus was insufficient to warrant combat related special compensation pay for hazardous duty." AR 273. It felt, in this case, "[the plaintiff's] duty was only hazardous because it was performed in a combat zone." AR 273. The BCNR explained that all the examples given in the DoD Program Guidance, "i.e. aerial flight, parachute duty, demolition duty, experimental stress duty, and diving duty, are duties that are dangerous by their nature and performing them in a combat related environment makes them even more dangerous warranting special compensation if an injury occurs." AR 274. Thus, "[it] concluded that [CDR Martin's] duty did not reach the same level of hazardousness to qualify." AR 274.

## II.    DISCUSSION

Before the Court are the parties' cross-motions for judgment on the administrative record. The issue for the Court to decide is whether plaintiff's service as a nurse in Afghanistan qualifies as "hazardous service" as the term is used in 10 U.S.C. § 1413a(e)(2)(B), and accordingly whether the DoD's interpretation of the term "hazardous service" is in accordance with the law.

Defendant argues that the DoD has interpreted a disability incurred while engaged in "hazardous service" to mean that the disability was incurred "during performance of duties that present a higher degree of danger to Service personnel due to the level of exposure to actual or simulated armed conflict" and that "actions incidental to a normal duty status not considered hazardous are not included." Def.'s Mot. at 2. Accordingly, while defendant acknowledges that plaintiff helped treat others that were exposed to actual armed conflict, it is argued that plaintiff herself was not exposed to actual armed conflict such that performance of her duties would qualify as hazardous service. Thus, defendant contends that the BCNR did not err when it rejected plaintiff's claim for CRSC. Defendant also argues that because congress granted DoD the authority to define "hazardous service," it's subsequent interpretations should be granted deference by the court under the standard announced in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which states that in the absence of clear Congressional intent, a court must give deference to an agency's interpretation of a statute provided that the agency's interpretation is based on a permissible construction of the statute.

Plaintiff believes that the DoD interpretation of the term "hazardous service" followed by the BCNR ignores the plain meaning of the term under the statute, and thus, the interpretation is arbitrary, capricious, and manifestly contrary to the statute and Congress's intent. Pl.'s Mot. at 2. Specifically, plaintiff contends that DoD has proffered two different interpretations of "hazardous service" over different forms and that the interpretation advanced by defendant and the BCNR is contrary to how "hazardous service" has been defined by other government agencies. Plaintiff further argues that by advancing the interpretation that it does, the DoD has effectively served to eliminate section (B) from 10 U.S.C. § 1413a(e)(2) because "a service member exposed to actual or simulated armed conflict would qualify for CRSC under subsection 'a' or subsection 'c'." Pl.'s Mot. at 15. Finally, plaintiff argues that *Chevron* deference is inapplicable because congressional intent is clear that "[b]y creating a category for 'armed conflict' and 'conditions simulating war,' Congress intended for 'hazardous service' to cover injuries or sickness distinctively different from the other two categories." Pl.'s Mot. at 17.

## a. Legal Standard

RCFC 52.1 provides for motions for judgment on the administrative record, which is "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). A judgment on the administrative record is appropriate "[w]hen proceedings before an agency are relevant to a decision in a case" before the court. RCFC 52.1(a). In reviewing cross-motions for judgment on the administrative record, the court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on

the evidence in the record." *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

### b. *Chevron* Deference

The Court's analysis of the instant case begins with the standard announced in *Chevron*:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question of whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 842-43. Furthermore, "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). When reviewing the interpretation of an agency, a court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." *Hymas v. United States*, 810 F.3d 1312, 1324 (Fed. Cir. 2016).

Beginning with the first step of *Chevron*, the Court concludes that Congress has not spoken to the precise question at issue – namely, what is the definition of hazardous service in relation to the CRSC statute of 10 U.S.C. § 1413a. The plain language of the statute makes this abundantly clear. 10 U.S.C. § 1413a(e)(2) concerns combat-related disabilities, and notes that "the term 'combat-related disability' means a disability that is compensable under the laws administered by the Secretary of Veterans Affairs and that was incurred (*as determined under criteria prescribed by the Secretary of Defense*) – (A) as a direct result of armed conflict; (B) while engaged in hazardous service; (C) in the performance of duty under conditions simulating war; or (D) through an instrumentality of war." (emphasis added).

It is clear, by the plain wording of the statute, that Congress intended for the Secretary of Defense (and by natural extension, the Department of Defense) to determine what criteria a service member would have to meet in order to be eligible for CRSC as a result of hazardous service. This position is confirmed by the Congressional Record. *See* 148 Cong. Rec. 21,844 (2002) (statement of Sen. Warner) ("We will rely on the Secretary of Defense to exercise his discretion to further define the nature of this service."); 148 Cong. Rec. 21,808 (statement of Rep. Hunter) ("The agreement does require the Secretary of Defense to establish a process and criteria for evaluating whether a disability is combat related.").

Plaintiff argues that "by creating a category for 'armed conflict' and 'conditions simulating war,' Congress intended for 'hazardous service' to cover injuries or sickness distinctively different from the other two categories." Pl.'s Mot. at 17. This argument has

no moment because it ignores the plain language of the statute, which announces that the Secretary of Defense is to prescribe the criteria which determines whether a service member incurred a disability while engaged in hazardous service. As read in the statute, the term "hazardous service" is facially ambiguous, especially considered in the context of a profession as generally fraught with peril and danger as military service. Indeed, the definition of "hazardous service" that plaintiff argues should apply is announced in the Financial Management Regulation and the initial DD Form 2860, two items promulgated by the Department of Defense and not Congress. *Id.* Accordingly, the Court holds that Congress did not speak on the precise definition of "hazardous service" and instead left the matter to the Department of Defense to decide.

### c. The Department of Defense's Interpretation of "Hazardous Service."

Having determined that Congress did not speak directly on the definition of "hazardous service" at it relates to CRSC, and rather delegated the authority to make that determination to the Secretary of Defense, the Court now turns to the second step required by *Chevron* to determine whether the Department of Defense's interpretation and application of the term "hazardous service" is arbitrary, capricious, or manifestly contrary to the statute. *See Hymas*, 810 F.3d at 1318 (quoting *Chevron*, 467 U.S. at 844). If the Department of Defense's interpretation is not arbitrary or capricious, then it is entitled to controlling weight that the Court must treat with the required deference.

In their fillings, the parties point to three main documents promulgated by the Department of Defense regarding the meaning of "hazardous service": the original DD

Form 2860 issued in May 2004, the updated DD Form 2860 issued in 2008, and the 2008

Financial Management Regulation.

As noted previously, the 2004 edition of DD Form 2860 defined hazardous service

as such:

> **While Engaged in Hazardous Service** – Such service includes, but is not
> limited to, aerial flight, parachute duty, demolition duty, experimental
> stress duty, and driving duty. A finding that a disability is the result of such
> hazardous service requires that the injury or disease be the direct result of
> actions taken in performance of such service. Travel to and from such
> service, or actions incidental to a normal duty status not considered
> hazardous are not included.

DD Form 2860 (2004). The language set forth in the Financial Management Regulation

in 2008 is identical to the above quoted language, and remains unchanged in the 2015

update of the Financial Management Regulation. DoD 7000.14-R, *Financial*

*Management Regulation*, vol. 7B, ch. 63, § 630202 (Dep't of Defense Sept. 2008); DoD

7000.14-R, *Financial Management Regulation*, vol. 7B, ch. 63, § 630202 (Dep't of

Defense Sept. 2015). DD Form 2860 was updated in 2008 and contains different

language as to hazardous service:

> **WHILE ENGAGED IN HAZARDOUS SERVICE (HS)** – The disability
> was incurred during performance of duties that present a higher degree of
> danger to Service personnel due to the level of exposure to actual or
> simulated armed conflict. The fact that a member incurred the disability
> during a period of hazardous service is not sufficient by itself to support a
> combat-related determination. There must be a definite, documented, causal
> relationship between the hazardous service and the resulting disability.
> Such service includes, but is not limited to, aerial flight, parachute duty,
> demolition duty, experimental stress duty, driving duty, and rescue
> missions.

DD Form 2860 (2008). Plaintiff takes issue with this change in language, contending that the 2008 version of DD Form 2860 is the only agency document to require exposure to actual or simulated armed conflict, and thus it fundamentally changed the definition of "hazardous service" to an extent that it contradicts every other agency interpretation of hazardous service. Pl.'s Mot. at 9. This newer interpretation, it is argued, is manifestly contrary to the intent of 10 U.S.C. § 1413a because Congress created four categories of service-connected disabilities that qualified for CRSC, some of which were intended to cover those injured in combat, while others, such as those engaged in hazardous service and those injured by an instrumentality of war, were intended to cover those injured outside of armed conflict. *Id.* at 15. By adding the requirement of exposure to actual or simulated armed conflict, plaintiff believes the Department of Defense has effectively removed the hazardous service section from 10 U.S.C. § 1413a because "a service member exposed to actual or simulated armed conflict would qualify for CRSC under subsection 'a' [as a direct result of armed conflict] or subsection 'c' [in the performance of duty under conditions simulating war]." *Id.*

Defendant argues that the Department of Defense's interpretation of hazardous service is in accordance with the law, and that the two definitions proffered by the 2004 and 2008 versions of DD Form 2860 are consistent, and that furthermore, plaintiff overlooks the limitation in the Financial Management Regulation ("FMR") that "actions incidental to a normal duty status not considered hazardous, are not included." Def.'s Reply at 3.

After consideration of the legislative history of the status and the subsequent interpretation of "hazardous service" set forth by the Department of Defense, the Court must conclude that the agency's interpretation is reasonable and not arbitrary or capricious and otherwise not contrary to the intent of the statute. It is eminently reasonable for the agency to require a combat-related nexus to the hazardous service in order to receive CRSC. By its plain terms and language, 10 U.S.C. § 1413a deals with *combat-related* special compensation, and subsection (e), under which the hazardous service language can be found, is entitled *combat-related* disability. Congressional statements on whether a combat-related nexus is required are inconclusive at best. Senator Levin noted that "[t]hese disabilities are sometimes called 'combat-related' disabilities for short. But that is really a misnomer. It is actually misleading to call certain of them 'combat-related disabilities' because the categories are far broader than simply combat-related." 148 Cong. Rec. 21,839 (2002) (statement of Sen. Levin). Plaintiff relies on this for the proposition that a combat-related nexus was not contemplated by Congress is passing the statute. Other statements, however, cut against that argument. For example, Representative Hunter noted that "if one is undertaking a hazardous operation, for example, if they are in a submarine or a swift boat or some other activity that is military-related, combat-related, and is a hazardous operation, even though they may not be exchanging gunfire with the enemy in that particular area of operations … they also will receive both checks." 148 Cong. Rec. 21,807 (2002) (statement of Rep. Hunter). Ultimately, it is unclear whether Congress intended for those engaged in hazardous

service in non-combat conditions to be eligible for CRSC under the hazardous service provision.

This requirement for a combat-related nexus was applied by the BCNR to plaintiff's case. In pertinent part, the BCNR reached the following conclusion:

> Your argument is that Congress did not intend to require a specific combat related nexus to the injuries incurred as a result of hazardous duty. The Board felt that Congress intended to require a specific combat related nexus to the injuries suffered as a result of hazardous duty. In the opinion of the Board, it was not Congress' intent to include any and all hazardous duty injuries for consideration of combat related special compensation. For example, the Board did not feel that an injury suffered by a Navy diver helping salvage a civil war relic would qualify under 10 U.S.C. § 1413; this despite the listing of "diving duty" in the DOD guidance as an example of hazardous duty. In the Board's opinion, this is because 10 U.S.C. § 1413 was implemented to cover combat related injuries.

AR 277. The parties were unable to cite to any BCNR decision that reached a contrary conclusion that a service member who engaged in hazardous duty in a non-combat related setting was able to recover CRSC. Tr. 11:10-24.[2] The BCNR went on to note that, in its view, "the examples  given in the DOD guidance, i.e. aerial flight, parachute duty, demolition duty, experimental stress duty, and diving duty, are duties that are dangerous by their very nature and performing them in combat related environment makes them even more dangerous warranting special compensation if an injury occurs." AR 278. It is clear then that the BCNR has taken the position that a combat-related nexus is required for receipt of CRSC. So long as that standard is consistently applied (and plaintiff has

---

[2] Citations to "Tr." Refer to the oral argument transcript. *See* Tr. June 22, 2017, ECF No. 20.

raised no argument to suggest that it has not been), the Court cannot say that the standard is arbitrary or capricious.

Furthermore, although plaintiff avers that the FMR and 2004 edition of DD Form 2860 provide the proper definition of "hazardous service" (i.e., without reference to a requirement of exposure to actual or simulated armed conflict), the language also ultimately proves fatal to plaintiff's case. Specifically, the FMR states that "[t]ravel to and from such service, or actions incidental to a normal duty status not considered hazardous are not included." Plaintiff does not allege that nursing duty is an action considered hazardous. At most, plaintiff contends that performance of that nursing duty at Camp Bastion in Afghanistan made a job normally not considered hazardous into hazardous service. Specifically, plaintiff notes that "Afghani locals, detainees, and POW's were housed in the hospital" and that workspace "included the hazards of a suicide vest, live ordinance, and reports of males wandering into the female spaces." Pl.'s Mot. at 3. This, however, is not enough to overcome the standard set by the Department of Defense for hazardous service. As the BCNR noted, "[i]n your case, the Board determined that performing medical work in a combat zone without a specific combat-related nexus was insufficient to warrant combat related special compensation pay for hazardous duty." AR 277. While there can be no doubt that nursing duty in a military hospital in Afghanistan is more trying than similar duty would be state-side, absent a specific allegation of combat causing her PTSD, it cannot be said that the BCNR's decision was arbitrary or capricious.

Moreover, an argument that normally non-hazardous jobs in the military automatically becomes hazardous merely because it took place overseas in a potential combat zone leads to a slippery slope which the DoD specifically sought to avoid. Plaintiff's argument must logically end in the conclusion that all service members who perform their duties overseas in dangerous combat zones are performing hazardous service, regardless of whether they are actually exposed to any armed conflict. This would create an untenable situation. The BCNR reached the same conclusion when considering plaintiff's case, noting that "[t]he Board felt that your duty was only hazardous because it was performed in a combat zone. That in itself was not enough since, using that rationale, every service member in the combat zone who suffers from PTSD would otherwise qualify for combat related special compensation pay." AR 277-78. Simply put, location alone is not enough to turn normally non-hazardous duty, such as nursing, into a hazardous one.

Finally, as defendant correctly notes, Congress has not taken any action to modify the Department of Defense's interpretation of hazardous service in the years since DD Form 2860 was modified. Indeed, although Congress has amended the statue several times in recent years, there has been no further clarification on the definition of hazardous service. *See* NDAA for Fiscal year 2013, Pub. L. No. 112-239, § 643(a), 126 Stat. 1632 (2013). In fact, Congress recently directed the Coast Guard to implement a combat related special compensation program using "the procedures and criteria prescribed by the Secretary of Defense pursuant to subsection (e)(2)" of 10 U.S.C. §

1413a. *See* Coast Guard Authorization Act of 2015, Pub. L. No. 114-120, § 221(a)(1), 130 Stat. 48-49 (2016).

Against this point, plaintiff argues that lack of Congressional action was not an endorsement of the Department of Defense's interpretation because "the broad inconsistencies could have misled Congress." Pl.'s Mot. at 18. This argument is unavailing. It simply does not follow logically that if Congress were aware of inconsistencies in how DoD was interpreting hazardous service, that Congress would somehow be misled into inaction. If anything, awareness of broad inconsistencies in interpretation would make it more likely that Congress would act to correct any discrepancies such that the intent of the statute was being achieved. Simply put, there is nothing on the record that would lead the Court to believe that Congress disapproved of DoD's requirement of a combat-related nexus for receipt of CRSC.

Ultimately, *Chevron* requires the Court to defer to the agency's interpretation of "hazardous service" as requiring a combat-related nexus. Plaintiff has failed to prove that such a construction is arbitrary, capricious, or contrary to the intent of Congress in passing 10 U.S.C. § 1413a. Neither has plaintiff cited to any inconsistencies in how the DoD has subsequently applied this interpretation when determining whether service members are eligible for CRSC. Whether the Court believes that such a definition for "hazardous service" is the best possible definition is irrelevant to the instant matter – the duty of the Court "is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute."*Hymas*, 810 F.3d at 1324.

Congress delegated to DoD the task of establishing criteria a service member must meet in order to receive CRSC for an injury incurred while engaged in hazardous service. The agency has subsequently determined one of those criteria is that the injury must have a combat-related nexus. There is no evidence that this criteria is manifestly contrary to the intent of Congress is establishing CRSC.

The Court is sympathetic to plaintiff, who bravely served her country and her fellow soldiers while stationed in Afghanistan.[3] DoD, however, was tasked with the difficult policy decision of drawing a line as to who is eligible for CRSC and who is not. Unfortunately, plaintiff falls outside the criteria for CRSC as has been established by DoD, and it is not the place of the Court to second guess this policy decision.

## III.   CONCLUSION

For the reasons discussed above, the following is hereby ordered:

1.  Plaintiff's motion for judgment on the administrative record is DENIED.

2.  Defendant's motion for judgment on the administrative record is GRANTED.

3.  Plaintiff's complaint is dismissed.

The Clerk is directed to enter judgment accordingly. No costs.

**IT IS SO ORDERED.**

BOHDAN A. FUTEY
Senior Judge

---

[3] The Court also takes notice that the Government shares a similar sentiment, stating that "there's no question that Nurse Martin is an American hero." Tr. 27:10-11.